This is also calendared in some places, Henderson v. Oregon. Each side will have about 15 minutes. Good morning. Good morning. Thank you, Your Honor. Hank Kaplan of Bennett Hartman Morrison Kaplan, here representing the petitioners and movements in the Santacroce and Ebner cases which are consolidated. I would request five minutes be reserved for rebuttal. Your Honors, the essence of our claim is very simple. The 1978 decree that was issued by Judge Solomon in this case mandated a certain level of benefits as a remedy for a Title VII violation. In 2003, the defendant P.E.R.B. reduced its benefits below that mandated level. The movements and the petitioners seek direct enforcement of the decree or at least a ruling that the change that occurred in 2003 was a violation of the 1978 decree. And all of the procedural arguments are basically attempts to avoid ruling on this fairly straightforward issue. Therefore, I would first like to address that central issue, which is what does the Solomon decree require and has P.E.R.B. met that requirement? This issue, in analyzing this issue, there are basically three sub-issues. What is the meaning of the plain language? The related question of what did the parties understand this language to mean? And the issue raised by the defendants about whether the court had adequate authority to sign this decree. Before I address those issues, I want to be explicit that this is not a case about mortality tables. The defendants repeatedly tried to characterize this as a case requiring P.E.R.B. to use the 1978 mortality tables, but that's not what we asked for. Our focus is on the refund annuity tables, which is what the pertinent portion of the decree addresses. So what does the plain language say? The decree is just two pages long. The context of this decree was that the state acknowledged that the female retirees who qualified for what is called the refund annuity benefit had been paid a lower pension benefit than their male counterparts, and the hard question was what was the appropriate remedy? One option was to reduce the male benefit and increase the female benefit. Another option was to bring the female benefit up to the level of the male benefit, and that's what's commonly known as the topping-up remedy. The defendant wished to avoid making retroactive payments, so it was agreed that in exchange for a forgiveness or waiver of any retroactive liability, it would top up the female benefits to the level of the male benefits. So to the decree itself, the second paragraph of the decree basically says, the use of separate male and female life expectancy tables in calculating the refund annuity is prohibited by Title VII, and we've never contended that the decree requires life expectancy tables to remain frozen, and indeed we've never understood that to be the case either, because in fact they did change the life expectancy tables shortly thereafter. The third paragraph of the decree is the paragraph that addresses the remedy. It starts by saying that beginning July 1, 1978, PERS will use one set of life expectancy tables for males and females. In the second half of the sentence, beginning with the word thereafter, which is the crucial phrase, it states that after July 1, 1978, the females will get the same annuity benefit that the males had received prior to that date. Then the last sentence in the third paragraph says that there will be no retroactive liability. The difficult question for the defendants, and the interviewer in this case, is what does the crucial phrase accomplish that has not already been accomplished by the preceding five lines? Our answer to that question is simple. Our language talks about equalizing the life expectancy tables in general, and then that crucial phrase talks about applying the 1978 male-only refund annuity tables to the females in the system. Let me ask you a question about that. Put it in the realm of science fiction to exaggerate the point. I'm sorry? I'm going to put my question in the realm of science fiction to exaggerate the point, but it's the questions of concern to me with the appellant's position. Let's assume that some scientific advance came along and that people now in the retirement system could live to the age of 250 with no problem. Is your position that the meaning of the consent decree is that they would have to be given an annuity level for the rest of their life? That's the same level that men had back before this decree was entered in the 70s. My question is, you can explain afterwards, but is your answer yes, that's your position, until the thing was modified? Yes. And, in fact, defendants repeat over and over that appellants are insisting that these 1978 rates be maintained forever, but that's simply a distortion of our position. The decree was subject to modification, and we've never proposed the prospective modification of the decree. The defendants, in fact, initially filed a motion for modification of the decree, and our response before the district court was that a prospective modification is fine. Just don't take away the benefits already earned and credited. Okay, but for the women in the system now who paid their contributions into the retirement system, and they'd already funded their retirement, your position is they would be paid based on the 1978 rates. There were 78 payouts for men, regardless of how long they were likely to live. Well, obviously, one option in the extreme science fiction scenario, one option would be that the modification would curtail those rates or would end the entitlement. As I said before, prospective modification is something that we haven't even objected to. I suspect in the extreme circumstance, we might even look at more extensive modifications. The bottom line, though, is that a motion for modification has never been approved in this case. In fact, the motion was withdrawn. Okay, thanks. I'll get back to you. How does Judge Lipscomb's ruling affect this decision one way or the other? Well, I don't believe it does. The defendants relied heavily on Judge Lipscomb's ruling as a basis for saying that this court should not upset that ruling, but that ruling, as we notified the court earlier, that ruling has since been vacated, so it should have no effect whatsoever on this case. The decree states that after July 1, 1978, females will get the same refund annuity benefit as the similarly situated males received before that date. It only mandates using the annuity tables. We've never claimed that the Solomon Decree mandates topping up forever, and PERS got away from the topped-up rates within a few years of the decree. So that's pretty much it. PERS' interpretation is that the decree did nothing except equalize the rates between males and females, and there are three basic flaws with PERS' argument. First, under PERS' analysis, it would have authorized the PERS board to reduce the refund annuity rates as soon as the ink was dry on the decree. The defendants' interpretation implies that the benefit remedy could have been eliminated at the outset, basically leaving the Henderson plaintiffs with no compensatory remedy at all. The second problem with PERS' analysis or its interpretation is that it doesn't guarantee that female PERS members would get the same rate that the retiring male members with whom they worked side-by-side back in 1978 received. And the third problem with the defendants' analysis is that it renders the thereafter clause of the third paragraph completely superfluous. The word thereafter means for so long as this decree is in effect or until modified. The defendants' interpretation doesn't require anything to happen on an ongoing basis, so that entire phase becomes, at best, redundant. You're asking for contempt, right? Well, we filed two actions. Oh, I know. You're not. Initially, yes. You're having so much difficulty. One side says one thing and the other side says the other. How does that get fair notice so that the defendants aren't in contempt? Well, we felt that the language of the decree was clear. The PERS board certainly was aware of the requirements of the decree, and we felt that, therefore, contempt was an appropriate remedy. But even if contempt, but even if the language of the decree was not clear from the face of the decree itself, looking at the extrinsic language should have made it absolutely clear what the intent of the decree was. Well, the extrinsic evidence, as I think the district judge said, and at least subject here in your argument what the district court said on this point made sense, was that the extrinsic evidence cut both ways. On the one hand, we have the point that you're raising, but on the other hand we have the fact that it was a sex discrimination suit under Title VII where the court would be authorized to equalize payments to men and women, and that's the meaning of the Supreme Court's language, but where the court would probably, you know, might not have authority to say women are going to get a certain amount that men got back at some earlier time and the amount paid to men could be changed. That would seem like that would violate Title VII. Well, actually, basically the settlement agreement was very clear. It said that both men and women would receive the topped-up rate effective in July of 1978, and thereafter the women would continue to receive that rate for as long as the decree was in effect. With all respect to Judge Mossman, his comment that the evidence cuts both ways simply isn't true. First of all, I would point out that this comes to the court by way of cross motions of summary judgment, so to the extent that he actually did an analysis of the evidence, that analysis would not be binding on this court, but if you look at the evidence, the evidence was certainly not only lopsided, it was uncontested. The minutes of the PERS Board are the most telling. The PERS Board discussed the ramifications of the Manhart decision, and they said we don't want to pay millions of dollars retroactively, and we don't want to reduce the male rate because we don't think that we can do that, so offer an increase of the female rate to the July 1978 male rate in exchange for a waiver of retroactive payment, and quoting the minutes, it says, to resolve the matter, the Board directed Mr. Hulsher to attempt a negotiated consent judgment with the plaintiffs, agreeing to increase the female annuity factor to that of the male rate effective July 1st, 1978, and thereafter. We submitted affidavits of all the people involved in this process, and they all basically confirmed that was the understanding, that was the interpretation, and we also submitted historical evidence that that is the interpretation to which PERS adhered for 25 years afterwards. I see I'm running short on time. Your opponents in their briefing urged that none of the claimants in the proceeding before Judge Solomon could have received a retroactive benefit because none of them had yet retired. What is your answer to that? First of all, Judge Solomon's decree did not just apply to the claimants before him. It very clearly applied to all the members of the PERS at the time, and in the minutes of the PERS Board, they acknowledge that, and they specifically say, you know, the judgment, the 1975 Judge Solomon opinion, is going to cost us $6 million a year. Nobody in this case is under the impression that we were just talking about the poor claimants before the court. I'd like to reserve some time for rebuttal. Thank you, Mr. Kaplan. Good morning. Good morning. May it please the Court, Joseph Malkin for defendants, appellees, members of the Oregon Public Employees Retirement System Board, which I will refer to either as PIRB or the Board. Judge Gould's question asked what he characterized as a science fiction question. The case actually presents a question of fiction and fantasy as an overall matter, because the question that these cases present is whether a 30-year-old consent decree in a Title VII civil rights case challenging PIRB's use of sex-segregated life expectancy tables to calculate certain retirement benefits mandates in perpetuity that all Oregon public employees receive benefits that were calculated on the basis of 1978 male life expectancies. That is such an astonishing proposition that even the appellants have walked away from the terms that they're advocating, and they have said, we never said it was in perpetuity. The decree itself has no limits. The decree will go on in perpetuity. And the reason it will go on in perpetuity is the reason that Judge Mossman found. This was a case brought by four plaintiffs, as Judge Gould's question brought out, none of whom were retired, who were looking forward and saw that retirement benefits were being set based on life expectancies that differed for men and women. And they brought a claim that under Title VII of the Civil Rights Act, this is not permissible. Judge Solomon ruled that the plaintiffs were right, that the use of sex-segregated life expectancy tables was a violation of Title VII. He ruled that in 1975. What then happened was that PIRB took an appeal. While that appeal was pending, the Manhart decision came down. And the appellants argue the Manhart decision changed the landscape, which it did in the sense that it took away any question of whether the use of sex-segregated life expectancy tables was a violation of Title VII. And in appellant's world, Manhart also created a threat to the PIRB's system of retroactive benefits, even though there was no claim for retroactive benefits, even though these plaintiffs could make no claim for retroactive benefits, even though these plaintiffs sued in their own capacity and not on behalf of any purported class. Well, Manhart itself recognized that it made a sea change in the law. And what the court said in Manheim is, Manhart, excuse me, quote, there can be no doubt that the prohibition against sex-differentiated employee contributions represents a marked departure from past practice. It went on. Retroactive liability could be devastating for a pension fund. Then, after analyzing the Albemarle decision, said, without qualifying the force of the Albemarle resumption in favor of retroactive relief, we conclude that it was error to grant such relief in this case. So on the basis of Manhart, there was no reasonable expectation that there would be retroactive relief. And, frankly, even if there was, the Solomon Decree, as interpreted by appellants, did not by PIRB anything. The decree that Judge Solomon entered was perspective-looking, requiring the equalization of life expectancy tables used to calculate refund annuities and, secondly, requiring that similarly situated female and male retirees receive identical benefits. Could that have been a change the day after Judge Solomon's ruling? Neither of those two propositions could have been changed, Judge Rhodes. What the Solomon Decree did not say, you have to use these particular life expectancy tables or you have to pay these particular benefits. PIRB could have, and indeed was required by Oregon law, to periodically adjust the actuarial factors that it used in calculating retirement payments in order to retain what the statute called the actuarial equivalency of different benefits. Consistent with the Solomon Decree, what PIRB could and should have done over the years was to adjust the life expectancies to take into account current experience and adjust the refund annuity tables to take into account the changes in life expectancies and any changes in assumed interest rate. What they had to do. They could have done it the next day after Judge Solomon's ruling. They could have changed the level of benefits and the life expectancies consistent with actuarial reports. What they could not do. What Judge Solomon prohibited them from doing was setting two different life expectancies, one for women, one for men, two different levels of benefits, one for women, one for men. So, Judge Solomon did not purport to take away the statutory mandate that PIRB had under Oregon law to maintain the accuracy of actuarial equivalency factors and the equivalency of different benefits. What he did take away was any discretion in the board to set those life expectancies and those benefits differently for men and for women. Mr. Malkin, let me ask you a procedural question. I understand completely the contempt argument. This thing is too confusing, too ambiguous to support a contempt on the part of the PIRB board members. Then he's got a separate declaratory judgment case going on, and instead of then construing the decree, he basically says, I took care of it in the contempt case, even though in the contempt case he's talking simply in terms of contempt. Do we need to send it back for him to, as far as the declaratory judgment part of this is concerned, to dot the I's and cross the T's and declare exactly what the decree meant? Well, the way I would answer that, Judge Silverman, is look at this from Judge Mosman's perspective. He had received extensive briefs. He had received all of the extrinsic evidence that the appellants cared to present to him in the contempt proceeding. He held a hearing that ran about 50 pages of transcript. And what the appellants say is the issue that we raised in our contempt motion and the issue that we raised in our motion to reopen, and that was the motion that Judge Mosman ruled on, which I'll address more specifically in a moment. Seeking a declaratory relief was the same question. It was, what is the meaning of the Solomon Decree? And they say, and we just have never gotten an answer to that question. Well, here's the thing that bothers me about the district court's decision on mootness in the companion case. It seemed to me in that transcript of his hearing that he was quite explicit in saying that he was resolving the contempt request based on the ambiguity of the order as opposed to what it really means now. I use some phrase like that. I could find it here pretty quickly. But he used some phrase in his reasoning toward the end of the hearing when he gave his views where he was distinguishing between what does the order mean and what's the significance for contempt. So it seemed to me that he wasn't at that hearing making a ruling construing the consent order. He was construing it sufficiently to say there shall not be a contempt award, but he wasn't really interpreting what does it definitely mean. And if I'm correct in that, then I don't understand how he could dismiss the declaratory judgment case on mootness grounds. If his ruling was so narrowly limited, then I think there's a lot of merit to what you say. But I think if you read what he said, he did two things. He did interpret the decree, and then, being a careful judge, he tailored his ruling, one could say to make it more bulletproof from appeal, specifically to the contempt standard. But at page 45 of the transcript, Judge Mossman says, I mean no insult to our craft that some people might be surprised that it takes this much work to determine the meaning of about 20 words. And at the very end of the hearing, he says, I have attempted to determine what Judge Solomon meant by his consent decree. And then he goes on, but if someone wants a modification, make a motion. He said I attempted, but he didn't say I did. Well, I guess you could parse it that way. But let me read to you what he said earlier, because I think he did make a specific finding in his oral ruling with respect to the meaning. And then, as I said, he went on and put that specifically in the context of the standard and the certainty required for a contempt finding. He said, and this is at page 46 of the transcript, I find that it is in its essence an order by Judge Solomon not to engage in gender discrimination in the refund annuity retirement allowances, and that that's what it does. That there is language referencing the date on which that order to match up the tables begins. And that was the July 1, 1978 date. And then he goes on to specifically address it in the context of contempt, looking at it only as a document of the principle. Paragraphs he would not tell PERB that reform legislation, which does not include within it. As far as I know, any gender discrimination in violation of this order would otherwise be in violation of it. So I think what Judge Mossman did in a fair reading here is he first interpreted it, and he said, in essence, this was a civil rights case. Judge Solomon issued a decree not to engage in gender discrimination, and he set the date on which that was to happen. And so when he said a lot of things during the course of the hearing, but when he actually made his ruling, it looks like, as opposed to being an alternative, in the alternative I'm going to say such and such, that he really wasn't making a final interpretation of this. It's somewhat exacerbated, for me at least, by the fact that he doesn't give reasons for his mootness ruling, does he? He just dismisses it in a minute order as moot, with no reasons given for that. No, the minute order does not contain any reasons. But that's why I said, looking at it from Judge Mossman's perspective, he's had this lengthy hearing. He said what he finds the order means, which is no discrimination based on gender. And then three months later, the same lawyers representing the same people. They changed a couple of people, but it's the same two leads. The declarations are the same. The briefs are the same. The evidence is the same. Come back and, on a declaratory relief, ask for the same two items that they asked for in contempt. They asked, first, find that PIRB is violating Judge Solomon's decree. Secondly, order PIRB to use the 1978 benefit tables for paying everybody in the system. And so from Judge Mossman's perspective, having just been down that road, having looked at all that extrinsic evidence, which he did admit, and having made a ruling, when he was tendered a motion to reopen again. Remember, that was what this came up on, a motion to reopen in order to seek a declaration that was identical to what he just ruled on. Judge Mossman exercised his discretion and said, you know, I've been there, done that. And, you know, certainly, standing there as the accompli. He actually didn't say, I've been there, done that. He just said, this just is moot. Well, I'm hypothesizing what he thought. And certainly from the memory. At a minimum, at a minimum, shouldn't we at least remand to the district court and ask him to give the reasons for his mootness ruling so that we're not sitting here speculating, maybe he means what you believe he means, and, you know, advocate with some skill, or maybe he meant something else. I really don't know what he meant. Well, I think you certainly could do that. I think you can rather clearly infer from, you know, the fact that the petitioners in that case said, we're relying on the same arguments and the same evidence, and it's just three months later. You can safely infer what his reasoning was. But I agree with you. As an appellee standing up here, would I much rather that he had articulated what I think clearly was in his mind and what I think this Court can very safely infer was in his mind? Yes, I absolutely would prefer that. The red light is on. Thank you. Thank you, sir. Mr. Kaplan, back to you. Thank you, Your Honors. The district court was envious about what he was trying to do or what he says he did, but he did at least one of two things. If the district court did decide in some sense the meaning of the Solomon Decree adversely to the Henderson 2 movements, then this Court should review the extrinsic evidence offered on the cross motions for summary judgment in Henderson 2 to determine whether that finding was supported by substantial evidence in the record. And I submit to you that it was not. If the district court did not examine the extrinsic evidence in order to, or did not make an express determination of the meaning of the Solomon Decree, then the extrinsic evidence that was offered on the cross motions for summary judgment, which is all in the record, may be examined by this Court to determine whether there is any issues of material fact that require remand to the district court to look at in order to determine the meaning of the Solomon Decree. Or this Court, of course, could, based on that evidence, determine the meaning itself. One of the points that was raised was that the PERS Board back then couldn't have been trading away retroactivity because they had no reasonable exposure to retroactivity. I submit to you that, first of all, that hindsight is not 20-20, because in Mr. Holscher's affidavit, he says quite expressly, and this is on page 98 of the excerpts of the record, in the Manhart case, the retroactivity of the award was a close question. I was concerned that under the standards set forth in Manhart in the Albemarle, the federal district court might order complete or partial retroactive reimbursement of the benefits to previously retired PERS members for which funding had not been reserved. So whether or not that was a wise concern on Mr. Holscher's part, and I submit to you it would be for the reasons discussed in the briefs, especially the Norris case, it was certainly a concern that was reflected in the third paragraph of the Consent Decree, which is the paragraph, of course, that says that there will be no retroactive payments to the petitioners. We did, the decree did change, require a change in the life expectancy, excuse me, the refund annuity tables. That change was to go forward until there was no longer a need for a remedial effect of the decree, and once the remedial requirements of the decree were satisfied, the decree could be modified, and modification might be appropriate certainly at this juncture, but the modification should not be retroactive. The modification should not take away the benefits of those individuals who have been members of the PERS system during the time the decree was in effect. How do you respond to the point your opposing colleague made that this was not a class action? And if none of the named parties had retired, how could the issue of retroactive benefits have been asserted? Well, certainly there was a judgment back in 1975, and even if we aren't talking about benefits for anybody prior to that time, it was clear from the judgment that the entire class was eligible for those benefits from 1975 forward. I thought it wasn't a class action. No, it was not a class action. Well, then let's not talk in terms of a class. Well, basically what could happen obviously was that other people, since the law was now settled, there was the option of converting the case into a class action and seeking benefits for as far back as the statute of limitations would permit. And that concern is reflected in the affidavit of the PERS attorney as well as the PERS director and the PERS assistant director at the time. One may say 20 years later, well, we don't think that the state of the law is as scary as it may have seemed to them, but that doesn't go to the question of whether there was an adequate quid pro quo or what was the meaning or intent of the parties when they entered into this decree. On the other side, the petitioners thought they were getting a pretty good deal by having the tables topped up, but just two years later, that didn't look like such a good deal either because as a result of the change in the rate of interest, the top-up tables became blended tables. And so, to that extent, they did not receive a windfall for more than a year or two after the decree was entered. And, in fact, the decree requirements were no more favorable than the actuarial requirements would have imposed until the 2003 legislation. That was the first time that the decree finally would have given some benefit to those members, those people who were members of the system while the decree was in effect. Thank you very much, Mr. Caput. Mr. Malkin, thank you. The case argued is submitted. The last case to be argued this morning is
judges: Silverman , Gould, Rhoades